1  SEAN K. KENNEDY (No. 145632)
   Federal Public Defender
2  (E-mail: Sean_Kennedy@fd.org)
   John Littrell (No. 221601)
3  Deputy Federal Public Defender
   (E-mail: John _Littrell@fd.org)
4  321 East 2nd Street
   Los Angeles, California  90012-4202
5  Telephone (213) 894-5310
   Facsimile (213) 894-0081
6
7  Attorneys for Defendant
   SERGIO SANTIAGO SYJUCO
8
9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  WESTERN DIVISION

12

13  UNITED STATES OF AMERICA,        )   NO. CR 12-37-RGK
                                     )
14              Plaintiff,           )   M O T I O N   T O   D I S M I S S
                                     )   INDICTMENT     BECAUSE     OF
15         v.                        )   OUTRAGEOUS    GOVERNMENT
                                     )   MISCONDUCT; MEMORANDUM
16  SERGIO SANTIAGO SYJUCO,          )   OF POINTS AND AUTHORITIES;
                                     )   DECLARATIONS; EXHIBITS
17              Defendant.           )
                                     )   DATE:      October 15, 2012
18                                   )   TIME:      1:30 p.m.
                                     )   JUDGE:     Hon. R. Gary Klausner
19                                   )   ROOM:      850
                                     )
20  _____ )   REQUEST   FOR   EVIDENTIARY
                                         HEARING
21

22  TO:   UNITED  STATES  ATTORNEY  ANDRE  BIROTTE,  AND  ASSISTANT

23  UNITED STATES ATTORNEY MARGARET VIERBUCHEN:

24

25       PLEASE TAKE NOTICE that on October 15, 2012 at 1:30 p.m., in the courtroom

26  of the Honorable R. Gary Klausner, United States District Judge, defendant Sergio

27  Santiago Syjuco will bring on for hearing the following motion:

28

## MOTION

Defendant Sergio Santiago Syjuco, by and through his attorney of record, Deputy Federal Public Defender John Littrell, hereby moves for an order dismissing the indictment based on outrageous governmental misconduct in the investigation of this case. This motion is made pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution, as well as this Court's supervisory power.

This motion is based on all files and records herein, the attached memorandum of points and authorities, the attached declarations and exhibits, and such other evidence, including witness testimony, as may be presented at the hearing on the motion.

Co-defendants Cesar Ubaldo, through his counsel David McLane, and Arjyl Revereza, through his counsel, George Buehler, join in the motion.

Respectfully submitted,

SEAN KENNEDY
Federal Public Defender

DATED: September 17, 2012          By: _/s/ John Littrell_____
                                   JOHN LITTRELL
                                   Deputy Federal Public Defender

1

# TABLE OF CONTENTS

2  MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . .  3

3  I. Introduction and Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

4        A.     The Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

5        1.     Roland Dacia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

6        2.     Cesar "Arvi" Ubaldo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

7        3.     Sergio "Yogi" Syjuco . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

8        4.     Arjyl Revereza . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

9        5.     FBI Agents Unilaterally Shipped the Container . . . . . . . . . . . . . . . .  9

10        6.     The Undercover Agent Solicited Prostitutes For Himself And
11                 The Defendants, And Some of Them May Have Been Minors . . . . . .  10

   II.       Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
12

13        A.     DISMISSAL OF THIS INDICTMENT IS WARRANTED
14              UNDER THE DUE PROCESS CLAUSE OF THE FIFTH
            AMENDMENT BECAUSE OF THE GOVERNMENT'S
15              OUTRAGEOUS MISCONDUCT  . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

16        1.     Creating Crime "Out Of Whole Cloth" In Order to Prosecute It  14

17        2.     Using Unwarranted Mental or Psychological Coercion . . . . . . .  20

18        3.     Conduct By Government Agents That Is *Malum In Se*  . . . . . . .  21

19        B.     DISMISSAL OF THE INDICTMENT IS ALSO AUTHORIZED
            UNDER THIS COURT'S SUPERVISORY POWERS . . . . . . . . . . . .  23

20        C.     AN EVIDENTIARY HEARING SHOULD BE HELD TO
21              DETERMINE THE FULL EXTENT AND NATURE OF THE
            GOVERNMENT'S OUTRAGEOUS MISCONDUCT . . . . . . . . . . . .  24

22  III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE(S)**

*Greene v. United States*,
454 F.2d 783 (9th Cir.1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 19, 20

*Hampton v. United States*,
425 U.S. 484 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17, 18, 22

*Kinsella v. United States*,
361 U.S. 234 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Olmstead v. United States*,
277 U.S. 438 (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Sherman v. United States*,
356 U.S. 369 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sorrells v. United States*,
287 U.S. 435 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Barrera-Moreno*,
951 F.2d 1089 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24

*United States v. Batres-Santolino*,
521 F. Supp. 744 (C.D. Cal. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Bogart*,
783 F.2d 1428 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Bonanno*,
852 F.2d 434 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Butler*,
567 F.2d 885 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Emmert*,
829 F.2d 805 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*United States v. Fernandez*,
388 F.3d 1199 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Gonzales*,
539 F.2d 1238 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Gurolla*,
333 F.3d 944 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Hasting*,
461 U.S. 499 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Kojayan*,
8 F.3d 1315 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ii

1

# TABLE OF AUTHORITIES (cont'd)

2

**FEDERAL CASES**                                                                    **PAGE(S)**

3

*United States v. Leung*,
    351 F. Supp. 2d 992 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4

*United States v. Prarie*,
    572 F.2d 1316 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

5

6

*United States v. Ramirez*,
    710 F.2d 535 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 22

7

*United States v. Ross*,
    372 F.3d 1097 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

8

9

*United States v. Russell*,
    411 U.S. 423 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

10

*United States v. Samango*,
    607 F.2d 877 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

11

12

*United States v. Simpson*,
    813 F.2d 1462 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22, 23

13

*United States v. Simpson*,
    927 F.2d 1088 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

14

*United States v. Williams*,
    547 F.3d 1187 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18, 22

15

16

17

**FEDERAL STATUTES**

18

18 U.S.C. §371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

19

22 U.S.C. §2778 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20

18 U.S.C. §922(l), 924(a)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

21

22

23

24

25

26

27

28

## **MEMORANDUM OF POINTS AND AUTHORITIES**

> Decency, security, and liberty alike demand that
> government officials shall be subjected to the same rules of
> conduct that are commands to the citizen.  In a government
> of laws, existence of the government will be imperiled if it
> fails to observe the law scrupulously.  Our government is
> the potent, the omnipresent teacher.  For good or for ill, it
> teaches the whole people by its example.

Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting).

## **I.**

### **Introduction and Factual Background**

Sergio Santiago Syjcuo, Cesar Ubaldo, and Arjyl Revereza are charged with Conspiracy, 18 U.S.C. §371, Importation of Defense Articles Without a License, 22 U.S.C. §2778, Importation of Firearms 18 U.S.C. § 922(l), 924(a)(1)(C), and Criminal Forfeiture.  Trial is scheduled to commence on November 13, 2012.

As set forth more fully below, the defendants became involved in this offense only after the government's effort to ensnare a true weapons trafficker fell apart.  More importantly, the actual crimes charged in this case -- importing weapons to the United States -- were committed by federal agents acting unilaterally, without any help from the defendants.  In their effort to manufacture jurisdiction for this crime, undercover F. B. I. agents deceived honest freight forwarders, and perhaps even U.S. customs officials, by deliberately lying on customs declarations.  The government's agents also shipped dangerous weapons to China, perhaps even without the permission of the Chinese government, and without taking necessary steps to ensure the weapons would not fall into hostile hands.  In order to induce the defendants to

participate, an undercover agent spent thousands of taxpayer dollars on prostitutes for himself and for the defendants. Many of these prostitutes were likely minors.

The government's actions in this case, if committed by a private citizen, would be serious federal crimes. These crimes were not victimless. Indeed, only months after an undercover agent paid thousands of dollars of taxpayer money for prostitutes at a well-known brothel in Manila, the Philippine government raided the brothel, and rescued twenty under-aged girls. The government's conduct in this case went far beyond any standard of decency, and warrants dismissal of the indictment.

A.   The Investigation

This case arose out of the Federal Bureau of Investigation's ("FBI") investigation of Transnational Asian Organized Crime ("AOC") groups involved in trafficking firearms. USA 323 (Affidavit of FBI Special Agent Dennis Lao).[1] Special Agents Dennis Lao and an undercover agent ("UC") working with him are field officers with the FBI's AOC unit based in West Covina, California. Id.

At various times unknown to the defense, Special Agent Lao and the UC traveled to the Philippines. Using undercover personae, the agents investigated weapons brokers. Id. The UC posed as a weapons broker by the name of "Richard Han." Throughout the investigation, "Richard" presented himself to the defendants as a broker for Mexican drug cartels. See USA 323. Special Agent Lao also acted in an undercover capacity, on at least one occasion posing as a body guard for Han.

During the course of their investigation, the agents also used the resources of an informant known to defendants only as "Andy."[2]  "Andy" posed as a member of

---

[1]  The facts presented here are taken from the discovery provided by the government (identified as USA __), as well as Declarations and Exhibits attached hereto. These facts are admitted for the purpose of this motion only.

[2]  The defense believes that the informant "Andy" may be a member of the "Black Dragon" gang, which "had as one of its primary purposes the commission of criminal acts, including murder, robbery, assault with a deadly weapon, and extortion. See People v. Lam, 2006 WL 3333588 (Cal. App. 2 Dist.) (unpublished); see also

"United Bamboo."  See USA 57.  "United Bamboo" is an AOC syndicate from Taiwan that is associated with the Triad, a larger criminal organization that is feared throughout Asia.  In his dealings with Mr. Syjuco and Mr. Ubaldo, the UC represented that "Andy" controlled the "drug" side of the business, whereas the UC (posing as "Richard Han") controlled the weapons side of the business.

### 1.   Roland Dacia

Between April and May of 2010,  Andy, acting under the Han's direction, made contact with people in the Philippines for the purpose of finding high-powered weapons for sale.  One of those people was Josh Han ("Josh," also known as "Josh Cayetano).  Andy asked Josh to help find high-powered weapons for sale.  USA 1891. Andy offered to pay Josh if he were able to broker weapons deals for him.  Acting at Andy's direction, Josh then made contact, thorough a friend of his from high school, with Alvin Alegre ("Alvin").[3]  Alvin referred Josh Han to Roland Dacia, an officer of a legitimate weapons company in the Philippines.  Dacia was a principal and part owner of JOAVI Weapons Systems, a licensed weapons dealer that contracts with the government to supply its armed forces and police forces.  See Exhibit A (Incorporation Documents for JOAVI / TALON).  Id.

In August, 2010, Dacia agreed to negotiate with Han for the purpose of consummating an illegal weapons transaction.  On October 1, 2010, Dacia agreed to sell 16 Bushmaster M4 rifles to the UC.  See USA 323 (Affidavit of Dennis Lao). During the next ten days, Dacia coordinated the delivery of the Bushmasters out of

---

Hoang v. Walker, No. CV 08-5651-GHK (AJW), 2011 WL 940208 (unpublished). The government has agreed to provide identifying information for the informant, subject to a protective order, but it has not yet provided any such information.  (The defense does not mean to suggest that the USAO has been negligent in failing to produce this information.  The AUSA has indicated that the government is simply waiting for a protective order, previously submitted, to be signed by the Court.)

[3] Due to some overlap between the last names of important people referenced herein, many of the individuals are referred to herein by their first names.

Camp Crame, in groups of four.[4]  Ultimately, only 12 of the 16 promised weapons were delivered.  The UC paid Josh $2,000 USD and Alvin $1,000 USD for helping to coordinate the deal.   USA 2056.  Neither Syjuco, nor Ubaldo, nor Revereza, had anything to do with that weapons deal, nor did they know the people who did.[5]

After the October 1, 2010 deal, Roland Dacia stopped doing business with Han.  On November 18, 2010, Dacia called Han and confirmed that he was no longer interested in doing any weapons sales with him.  USA 67.

On November 14, 2010, Special Agents Lao and Richard Han met with Josh and Alvin at a Chinese restaurant.  USA 65.  Josh and Alvin complained that they not been paid their commission from Dacia, and they felt personally responsible for Dacia's refusal to do more business with Han.  They felt that they had "lost face" and "wanted to redeem themselves by introducing [Han] to a new weapons supplier."  USA 66. The "new supplier" was Cesar Ubaldo, a friend of Alvin's relative.  Id.

## 2.   Cesar "Arvi" Ubaldo

Unlike Roland Dacia, who was a sophisticated and licensed weapons broker, Ubaldo was an inexperienced and relatively young man.  Ubaldo is known to friends and family as "Arvi."  Ubaldo grew up in Alabang City, a suburb of Manila, and attended the Southridge Private Boys School, a private boys school.  After high school, Ubaldo graduated from the University of the Philippines in Manila.  Ubaldo has no prior criminal record, and no history of arrests or convictions.  Exhibit C.

In November 2010, Ubaldo's childhood friend told him that the cousin of a friend was interested in buying weapons.  The "cousin of a friend" turned out to be Alvin.  See USA 2074.  On November 16, 2010, Alvin introduced Ubaldo to Han and

---

[4]  Camp Crame is a repository that is licensed by the Philippine National Police ("PNP").  USA 2048-56.  It is a repository for all types of legal weapons in Manila, including those used by law enforcement and those sold privately.

[5]  The government concedes that none of the defendants in this case were participants in the sale of the Bushmaster rifles.  See Exhibit B (May 14, 2012 letter from Assistant United States Attorney Margaret Vierbuchen, at p. 9).

Andy.  On November 19, 2010, Ubaldo arranged for Han, Josh, and Alvin to come to the Syjuco family home in Alabang City.  Sergio Syjuco was out of town.  But his brother Marco showed Han an M4 rifle.  USA 68; USA 323.

During the ensuing months, Han made it clear to Ubaldo that he was interested in "heavier stuff," and particularly, high caliber weapons, like the M-4 rifle that he had previously viewed at the Syjuco home.  See USA 70.  Ubaldo tried at several points to interest Han in ballistic vests instead of weapons.  Id.  Ultimately, Han agreed to purchase some ballistic vests from Ubaldo, but only if they were accompanied by some high-powered weapons as well.  See USA 70.

In response, on January 10, 2011, Ubaldo prepared a list of weapons for Han that were supposedly in Ubaldo's "inventory."  See USA 72-75.  Ubaldo and Han ultimately agreed that Ubaldo would arrange for Han to purchase an M82 for $30,000 USD.[6]  Han also asked Ubaldo if he knew of someone who could help him export the weapons from the Philippines.  USA 75.  Ubaldo offered to introduce him to Arjyl Revereza, a friend of his who worked in Philippines Customs.  Id.

### 3.    Sergio "Yogi" Syjuco

Sergio Syjuco is known to his friends and family as "Yogi."  Like Ubaldo, Syjuco also grew up in Alabang City, and he also attended the Southridge Private Boys School.  See Declaration of Giannina De Leon at ¶ 2.  After graduating from high school in Manila, Syjuco studied for a time in Canada, but he was finishing his studies at LaSalle University in Manila in 2010.  Id. at ¶ 3.  Syjuco studied marketing, and hoped to earn his degree within a year.  Like Ubaldo, Syjuco has no criminal record.  See Exhibit D (certifications from Ayala Alabang, Muntinlupa City, Mayor's Clearance - Muninlupa City, NBI clearance, and PNP clearance).

When Ubaldo contacted Syjuco and told him that he knew a man who would

---

[6]  An M82 is a semi-automatic .50 caliber sniper rifle manufactured by Barrett Firearms.  It is a military-grade sniper rifle that is used by the United States military.

pay $30,000 for a .50 caliber rifle, Syjuco agreed to help find one to sell to him. On February 23, 2011, Han, Andy, and Ubaldo met at the Heritage Hotel in Manila. When Syjuco showed up, Han produced $30,000 in US Dollars, and Syjuco gave him a Safety Harbor .50 caliber hunting rifle. USA 77.[7] Han asked Syjuco to give him his phone number and email address, and Syjuco complied. Id. In the coming days, Han called Syjuco several times a day to discuss future deals. Id.

On February 25, 2011, Syjuco sold an M14 rifle to Han for $9,800 in US Dollars. USA 78. Han pressured Syjuco to increase the number of weapons involved in the deals. He asked Syjuco if he could handle an order of a minimum of 20 automatic weapons such as AK-47s. Id. Although Syjuco claimed that he could fill a large order, he did not know how to get that many weapons for Han.

In the first week of May 2011, Syjuco told Han by e-mail that he wasn't able to get grenade launchers, as Han had requested. See USA 80. Han told Syjuco that he was not pleased with his shortcomings, but he would accept them only once. In future deals, he explained, failing to deliver the weapons promised "would not be acceptable." Syjuco promised that this would "never happen again." Id.

Syjuco eventually delivered various tattered weapons to Han, who was then accompanied by Special Agent Dennis Lao (acting as Han's bodyguard). USA 85. After transferring the material to Han's car, Han told Syjuco to follow Han to a motel in Manila, and come upstairs to help pack the weapons. In the lobby of the motel, Han instructed Syjuco that he had "additional weapons upstairs" that needed to be packaged as well. USA 86. Han then ordered Syjuco to follow him to a warehouse at the port. There, he instructed Syjuco to load the boxes of weapons that he had helped to pack into a shipping container. Id. Among the weapons in the hotel room were the 12 Bushmaster M4 rifles that the government had purchased nine months before, in a

---

[7] A Safety Harbor .50 caliber rifle is a big-bore hunting rifle. It is a bolt-action weapon, capable of firing only one shot per trigger pull. It is not a "sniper" rifle, and it has no military application. It has a market price of approximately $3,000. It is legal to possess in the both the Philippines and in the United States.

1  totally unrelated transaction in which Syjuco was not involved.

2

3              4.    Arjyl Revereza

4      On about May 9, 2012, Ubaldo introduced Arjyl Revereza to Han.  USA 81.

5  Arjyl Revereza, who just turned 26 years old, grew up in Albay province of the

6  Philippines about 500 kilometers south of Manila.  He graduated from Systems

7  Technical Institute in Albay before moving to Manila where he was employed at the

8  Manila airport as a customs officer. He, too, has no history of convictions or arrests.

9      Han offered to pay Revereza approximately four thousand dollars to use his

10  influence as a customs official to ensure that the shipping container containing

11  weapons leaving the harbor was not inspected.  Id.  But there is no evidence that

12  Revereza had the ability to facilitate the passage of goods through the harbor, or that

13  he took any action to ensure that the container would not be inspected.

14

15              5.    FBI Agents Unilaterally Shipped the Container

16      Syjuco, Ubaldo, and Revereza played no part in importing the container to the

17  United States.  Special Agents Lao and the UC shipped the container on their own.

18      On April 12, 2011, Special Agent Lao, using the name "Dennis Tolentino" and

19  the e-mail address noworries24@hotmail.com, contacted Brian Wong, the owner of

20  NV Logistics, via e-mail to arrange for a container shipment from Manila to Long

21  Beach.  Declaration of Brian Wong at ¶¶ 2-3.  NV Logistics is an international

22  shipping and freight-forwarding business in Alhambra, California.  Id. at ¶ 1.

23      Lao indicated that he was the primary contact, but that the real shipper's name

24  was "Richard Han."  Id. at ¶ 2.  Lao claimed that it was the first time he had shipped a

25  container.  Id.  He did not identify himself as an FBI agent, and he did not inform

26  Wong that the material that he intended to ship was contraband weapons.  He did not

27  inform Wong that "Richard Han" was not a real person, but rather a false identity

28  created by an undercover FBI agent for the purpose of an investigation.

1  The undercover agent filled out the shipping documents provided to him, and
2  signed the name "Richard Han."  The Ocean Bill of lading noted "shipper's count and
3  load," indicating that the only person who inventoried the contents of the container
4  was "Richard Han" himself.  Wong Declaration at ¶ 8.  The undercover agent also
5  filled out the export declaration and signed it with the false name "Richard Han."  In
6  the declaration, the undercover agent falsely claimed that the shipping container was
7  loaded only with "furniture / personal effects."  Id. at ¶¶ 7-8.

8  On May 16, 2011, the container was brought to Manila's "North Port," a port
9  where Revereza did not work.  See USA 1843 (Philippines Export Declaration). There
10  is no evidence that the container was ever inspected in the Philippines.

11  On May 18, 2011, the container was loaded onto the Song Jung He, a ship
12  docked at Manila's North Port.  Rather than traveling directly to Long Beach, the
13  container first shipped to Xiamen, China, PRC.  See Wong Declaration at ¶ 9.  The
14  container was offloaded and sat in the harbor in Xiamen for approximately four days.[8]
15  Id.  The container was then re-loaded aboard another boat, the CISCO Indonesia, and
16  that ship sailed for Long Beach on about May 25, 2011.  Id.

17  On June 7, 2011, the container arrived in Long Beach and was delivered to G &
18  J Express trucking in Commerce, California.  Id. at ¶ 10.  On June 15, 2011, Special
19  Agent Lao, using the false name "Dennis Tolentino," unloaded it.  Id.

20

21  6.  The Undercover Agent Solicited Prostitutes For Himself And The
22      Defendants, And Some of Them May Have Been Minors

23  On several occasions, the undercover agent invited Syjuco, Ubaldo, Revereza
24  and others to "Air Force One,"  "Area 51," and other brothels in and around Manila in

25  _____

26  [8]  It is unknown to the defense whether the container was opened during the
27  time it sat in the harbor in Examen, China, or whether its contents were emptied or
    changed by anyone. The government has not produced chain of custody documents
    for the shipping container.  Moreover, it is not clear whether Han obtained permission
28  from the Peoples Republic of China to ship weapons and explosive there, and if he did
    not, whether the shipment was in violation of Chinese and international law.

order to reward them for their efforts and encourage them to continue looking for weapons.  Using the name "Richard Han," he ordered prostitutes, and paid for himself and others to have sex with the prostitutes.  Some of the girls solicited by the undercover agent on behalf of himself and others were likely minors.

Many meetings at strip clubs and brothels are reflected in the discovery produced by the government.  See USA 2041 (describing August 23, 2010 visit to Club 9); USA 2047 (describing September 30, 2010 visit to Club 9 in a private room); USA 2055 (describing October 5, 2010 meeting at Area 51 in a private room); USA 66 (describing November 16, 2010 visit to Area 51); USA 74 (describing February 22, 2011 visit to Area 51); USA 82; 2084 (describing May 9, 2011 visit to Air Force One in private room from 10:15p.m. to 2:30 a.m.); USA 2088 (describing May 13, 2011 visit to "night club"); USA 2090 (describing May 17, 2011 visit to Air Force One in private room); USA 93 (describing September 23, 2011 visit to Area 51); USA 2092 (describing September 24, 2011 visit to "night club" in private room);  USA 94; 2094 (describing September 26, 2011 visit to Air Force One in private room).  But many more visits to strip clubs and brothels are not disclosed in the discovery, and none of the reports provided by the government in discovery reveal the fact that government agents were paying for sex with prostitutes.

For a period of time in 2011, Han and Andy visited Area 51, a strip club and brothel located just south of Maced. City, weekly.  Declaration of Richard Off at ¶ 4; see also Declaration of Raelene "Precious" Hernandez at ¶ 5.  Ariel Ascus, a manager of Area 51, reports that Han always paid for everything, including alcohol, private rooms, food and girls for the people he brought in to the club.  Id. at ¶ 23.  Han paid for the people in his party to have sex with the girls, and Mr. Ascus took the cash from Han directly.  Id.  Han particularly liked a girl at Area 51 named Natasha, who was beautiful, but did not speak much English.  Id. at ¶ 12.  Han would often ask for Natasha when he came in and paid to have sex with her.  Id.  Mr. Ascus often put Han and his party in the "Platinum Room," the largest private

11

room in the club.  Id. at ¶ 13.  Han spent 80,000 to 100,000 pesos (approximately $1,900 to $2,400 U.S. dollars) each time he visited Area 51.  Id. at ¶ 5.

According to Gerry Albright, a manager at Air Force One, Han visited the club on several occasions.  Id. at ¶ 22.  Han drank whiskey or scotch when he visited the club.  Id. at ¶¶ 23, 26.  Han was abusive and degrading to the prostitutes, who are colloquially known in Manila as "Guest Relations Officers" or "gros."  On one occasion, Han demanded that several prostitutes in the club line up and drink five shots of hard liquor.  Most of the girls did so, but one of them, who was very small, could not drink the liquor and poured it out.  Mr. Albright stated that Han yelled at the girl and forced her to drink the alcohol until she vomited.  Id. at ¶ 24.  Albright stated that Han would usually get between five and seven girls per night when he visited Air Force One.  Id. at ¶ 27.  Han would direct the people in his group to pick a girl to have sex with, and Han himself paid to have sex with several girls.  Id. at ¶ 28.

The government concedes that its undercover agent spent a total of $14,500.00 on eight particular days in 2010-11 in which he was in clubs in the Philippines when Syjuco, Ubaldo, and/or Revereza were present.  Exhibit E (August 23, 2012 Letter from AUSA Margaret Vierbuchen).  Although the government represents that these expenditures were for "entertainment and cocktail (tips included)," it is impossible that the agent could not have known that the money went toward prostitutes.  On May 9, 2011, The agent was entertained for several hours in a private room at Air Force One, a prostitution club.  See USA 80.  He sought reimbursement of more than three thousands dollars for "entertainment and cocktail (tips included)" for that night.  Id.

On May 3, 2012, the National Bureau of Investigation ("NBI") received a tip from the International Justice Mission, a non-governmental organization, that Area 51 was "engaged in the trafficking of minors by hiring them to work as Nude Dancers and Guest Relation Officers (GO) who provided extra sex services to the club's customers."  Exhibit F (May 7, 2012 Inquest Proceeding and Recommendation for Prosecution by NBI, Anti-Human Trafficking Division) at 3.  That evening, the NBI

12

conducted surveillance at the club, and confirmed "the presence of GO[]s who appear to be minors who not only dance in full nudity but were also offered to the customers as GO[]s who can sit at the table of patrons, and for extra fee, can be taken to the VIP ROOMS inside the club to provide possible sex services." Id.   As part of the investigation, National Bureau of Investigation, Anti-Human Trafficking Division ("NBI-AHTD") Officer Gennady Chiong reportedly paid $3,000 Philippine Pesos (approximately $70 USD) in consideration [for] a sex service. Id.

On May 5, the NBI conducted a rescue operation on Area 51.  Sixty (60) victims of sex trafficking were rescued, and investigation revealed that 19 were minor girls.  Seven floor managers from the club were arrested, and several more were recommended for prosecution for trafficking in under-aged prostitutes. Id.

## II.

### Argument

A.    **DISMISSAL OF THIS INDICTMENT IS WARRANTED UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT BECAUSE OF THE GOVERNMENT'S OUTRAGEOUS MISCONDUCT**

Outrageous government misconduct in the investigation of an offense justifies the dismissal of an indictment if it violates the defendant's right to due process. United States v. Barrera-Moreno, 951 F.2d 1089, 1091 (9th Cir. 1991) (citing United States v. Simpson, 813 F.2d 1462, 1464-65 (9th Cir. 1987).  To constitute a due process violation, "the government conduct at issue must be fundamentally unfair and shocking to the universal sense of justice." United States v. Russell, 411 U.S. 423, 432 (1973) (quoting Kinsella v. United States, 361 U.S. 234, 246 (1960)).

"Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." United States v. Williams, 547 F.3d 1187, 1199 (9th Cir. 2008) (internal quotations omitted).  A motion to dismiss based on

13

1   outrageous government misconduct "is a close relative of entrapment and has been
2   applied where the involvement of undercover agents and informers in contraband
3   offenses reaches 'such proportions as to bar conviction of [even] a predisposed
4   defendant as a matter of due process.'"  United States v. Ramirez, 710 F.2d 535, 539
5   (9th Cir. 1983) (quoting Hampton, 425 U.S. at 493)(Powell, J., concurring)).

6       Whether government misconduct in a particular case constitutes a due process
7   violation turns on the totality of the circumstances, and each case must be decided on
8   its unique facts.  Hampton v. United States, 425 U.S. 484, 493 (1976).

9       The issue of whether the government's misconduct is so outrageous as to
10  violate due process and warrant dismissal of an indictment is an issue of law for the
11  Court to decide.   United States v. Gonzales, 539 F.2d 1238, 1239-40 (9th Cir. 1976);
12  see also United States v. Batres-Santolino, 521 F. Supp. 744, 750 (C.D. Cal. 1981).

13      The Ninth Circuit has recognized three general types of circumstances under
14  which the government's misconduct was so extreme as to violate due process:  The
15  first circumstance is where the government, through its agents, created the crime out
16  of "whole cloth" merely for the purpose of prosecuting it.  See, e.g., United States v.
17  Bogart, 783 F.2d 1428 (9th Cir. 1986).  The second is where the government used
18  unwarranted physical or mental coercion to instigate or encourage the crime.  See id.
19  The third is where the government's conduct is so morally wrong, standing alone, that
20  it constituted "action *malum in se*," such that the wrongfulness of the government's
21  conduct alone justifies dismissal.  See, e.g., United States v. Ramirez, 710 F.2d 535,
22  539 (9th Cir. 1983).  All three circumstances are present in this case.

23

24      1.   Creating Crime "Out Of Whole Cloth" In Order to Prosecute It
25      "The function of law enforcement is the prevention of crime and the
26  apprehension of criminals. Manifestly, that function does not include the
27  manufacturing of crime." Sherman v. United States, 356 U.S. 369, 376-77 (1958)
28  (quoting Sorrells v. United States, 287 U.S. 435, 442 (1932)).  "[G]eneration by

14

police of new crimes merely for the sake of pressing criminal charges against the defendant" violates due process and warrants dismissal.  Ramirez, 710 F.2d at 540.

In Greene v. United States, 454 F.2d 783 (9th Cir.1971), the Ninth Circuit reversed conspiracy and bootlegging convictions where a government undercover agents helped to re-establish, and then sustain, criminal bootlegging operations that had been shut down by prior criminal convictions.  In that case, an ATF agent, posing as a gangster, had helped to set up a raid of the defendants' illegal whiskey still, which resulted in their convictions for selling bootleg whiskey.  While the defendants were out on bail in that case, the same agent contacted the same men again, and offered to help them re-establish the same whiskey still that had been raided.  The agent, still posing as the same gangster, offered to purchase whatever whiskey the defendants could produce, and offered to help them find a location and raw ingredients for the still.  Id. at 784.  When the defendants expressed concerns about going back into business, the agent told them "the boss is on my back."  Id. at 785.

Although the defendants "talked in grandiose terms" of committing criminal activity in order to impress the supposed gangster agent, they were in fact "reluctant to act and might never have produced any bootleg alcohol" but for his prodding.  Id. at 786.  Based on the defendants' new conduct in distilling bootleg whiskey, they were arrested and convicted again.  The Ninth Circuit reversed the convictions.  It noted that an entrapment defense was not viable for the defendants because they were, in fact, predisposed to commit the crime.  But it dismissed the indictment based on the agent's aggressive conduct in instigating the crime.  The Court relied on the fact that the agent, not the defendants, initiated the crime, that the agent was substantially involved in the operation, offering to provide both the hardware and some of the ingredients for the still, that the agent pressured the defendants to go through with the crime.  Id.  The Court held that the government may not "involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators."  Id. at 787.

Likewise, in <u>United States v. Batres-Santolino</u>, 521 F. Supp. 744 (C.D. Cal. 1981), the Court dismissed an indictment against four defendants accused of drug trafficking on the ground that, as in <u>Greene</u>, the government had "'manufactured'" a crime that "could not and would not have been committed" but for the government's conduct. <u>Id.</u> at 752.  In <u>Batres-Santolino</u>, a paid informant approached the defendants, who had no previous involvement in drug trafficking, and indicated that he had a source that could supply them with cocaine to import into the United States and sell. <u>Id.</u> at 748.  The defendants followed up by meeting with an undercover agent in Ecuador posing as a cocaine dealer, but they had no money and did not know how they were going to get it.  When the defendants did not take further steps to complete the deal, the informant contacted the defendants and told them that the "big man" was holding him responsible for the delay in completing the transaction, and encouraged them to pursue it.  The informant also told them that he could help them make "substantial profits" in legitimate, unrelated deals with the Ecuadoran government. <u>Id.</u>  Knowing that the DEA was not interested in pursuing a small scale deal, the paid informant instructed the defendants to portray themselves as large-scale traffickers in order to impress the "big man." <u>Id.</u> at 749.  But it was immediately apparent to the undercover agent that the defendants were not the large-scale traffickers that they purported to be, and had no means to import cocaine to the U.S.

The district court dismissed the indictment, recognizing that the crime had essentially been manufactured by the government and its agents.  The Court reasoned that the defendants were "obvious novices" and that it is "inconceivable that they could have entered the secretive world of international drug smuggling on their own." <u>Id.</u> at 751.  Because it was obvious that "the defendants had no organization or ability to smuggle drugs into the United States," the Court found, "the government obliged them and arranged that part of the enterprise as well." <u>Id.</u>  The Court held that the crime "could not and would not have been committed" had the informant not "inveigled defendants into it and offered to provide them with an otherwise

1   unavailable source of supply of the illegal drug they were to import." <u>Id.</u> at 752.

2   Thus, it reasoned, it was "not a case where the government is ferreting out ongoing

3   criminal activity.  It is a case where the government, through its agents, went about

4   putting persons into the business of crime for the first time." <u>Id.</u>

5       By contrast, a government agent who merely aids the defendants in committing

6   a crime that was already in progress does not violate due process.  In <u>Russell</u>, an

7   undercover government agent offered to help the defendants manufacture

8   methamphetamine in exchange for one half of the drugs produced.  411 U.S. at 425.

9   The undercover agent offered to supply the defendants with phenly-2-propanone, a

10  precursor chemical that was legal, but difficult to obtain.  <u>Id.</u> at 426-27.  The Supreme

11  Court acknowledged that government over-involvement of law enforcement officers

12  could, under some circumstances, be "so outrageous that due process principles would

13  absolutely bar the government from invoking judicial processes to obtain a

14  conviction[.]" <u>Id.</u> at 431.  But it held that the facts did not warrant such a bar.  The

15  Court reasoned that the government did not instigate the crime; it was "already in

16  process." <u>Id.</u> at 432.  It also noted that the government did not provide the

17  defendants with a means to commit the crime that they did not already have.

18  Likewise, in <u>Hampton</u>,, the Supreme Court held that the government's involvement in

19  a drug crime was not so outrageous as to warrant dismissal where the defendant was

20  already engaged in drug trafficking, but an informant supplied the defendant with the

21  particular heroin that defendant sold to an undercover agent.  425 U.S. at 490.  The

22  <u>Hampton</u> Court relied on its earlier decision in <u>Russell</u>, and reasoned that there was

23  no due process violation because "the police, the Government informant, and the

24  defendant acted in concert with one another." <u>Id;</u>[9] <u>see also</u> <u>United States v. Gurolla,</u>

25  _____

26      [9]  Three justices in the majority went further, purporting to rule out the notion
    that government misconduct could be the basis for a due process defense if the
27  defendant was otherwise predisposed to commit the crime.  <u>Id.</u> (holding that "[t]he
    limitations of the Due Process Clause of the Fifth Amendment come into play only
28  when the Government activity in question violates some protected right of the
    Defendant."). <u>Id.</u>  But two concurring justices explicitly rejected that portion of the

1   333 F.3d 944, 951 (9th Cir. 2003)("Because the government did not initiate the

2   criminal activity, but rather sought to crack an ongoing operation, its conduct was not

3   outrageous and did not violate due process."); United States v. Williams, 547 F.3d

4   1187, 1199 (9th Cir. 2008) (no violation of due process where defendant was already

5   planning to commit a bank robbery, but undercover agent convinced him to rob a fake

6   "stash house" instead).  In Williams, the Ninth Circuit relied on a five-factor test, set

7   forth in United States v. Bonanno, 852 F.2d 434 (9th Cir. 1988), to determine whether

8   the government's conduct violated due process:

9        (1)     [whether] the defendant was already involved in a continuing series of

10  similar crimes, or the charged criminal enterprise was already in process at the time

11  the government agent became involved;

12       (2)     [whether] the agent's participation was not necessary to enable the

13  defendants to continue the criminal activity;

14       (3)     [whether] the agent used artifice and strategem to ferret out criminal

15  activity;

16       (4)     [whether] the agent infiltrated a criminal organization; and

17       (5)     [whether] the agent approached persons already contemplating or

18  engaged in criminal activity.

19  Id. at 1199-2000 (quoting Bonanno, 852 F.2d at 437-38).

20       All five of the Bonanno factors indicate a violation of due process in this case.

21       First, the defendants in this case were not "already involved in a continuing

22  series of similar crimes."  None of the defendants in this case had any criminal

23  history, and none had ever been involved in importing weapons to the United States.

24       Second, the agent's participation was absolutely necessary in order to facilitate

25  the crime. Special Agents Lao and the undercover agent unilaterally arranged for the

26  _____

27  decision, id. at 495 (Powell, J., concurring), as well as three of the dissenting justices,
    id. at 497 (Brennan, J., dissenting).  The Ninth Circuit has since recognized that

28  Hampton did not foreclose a due process defense based on outrageous government
    misconduct.  See United States v. Prarie, 572 F.2d 1316, 1319 (9th Cir. 1978).

shipment of the weapons to the United States, coordinating with a logistics company and filling out forms without any involvement by the defendants.  Although the UC lured Syjuco into a hotel room in order to "assist" him in packing the weapons, and later sought his help in loading the boxes into a shipping container, he did not actually need Syjuco's help. The only reason for involving Syjuco in the packing was to gather evidence in order to prosecute him.  Similarly, although the UC purported to bribe Arjyl Revereza in order to ensure that the weapons cleared Philippine customs, there is no evidence that Revereza did anything to facilitate the shipment.

Third, the undercover agent used "artifice and strategem" to set up the defendants. In addition to lying about his identity, he plied the defendants with alcohol and prostitutes.  But the "artifice" was not to ferret out criminal activity committed by the defendants, because prior to the UC's appearance, there was none.

Fourth, the undercover agent did not infiltrate a criminal organization.  He merely incited three immature young men to get involved in a crime they had no experience with, and were not capable of accomplishing on their own.  See Batres-Santolino, 521 F. Supp. at 751.  This was obvious to the undercover agent.  Although he may have hoped that the investigation would eventually lead to a corrupt military official or other true "criminal organization," his efforts did not bear fruit.

Fifth, the undercover agent did not approach "persons already contemplating or engaged in criminal activity."  None of the defendants had any experience in the illegal weapons trade, and none had imported anything to the United States.

The facts of this case are similar to Greene and Batres-Santolino.  As in Greene, where an ATF agent, posing as a "gangster," initiated the criminal conduct by deliberately seeking out the defendants, in this case, the undercover agent, posing as a weapons broker for a Mexican drug cartel, deliberately sought out guns.  When an established weapons trafficker refused to do business with him, he widened his search, and settled for the defendants in this case, who, like the defendants in Batres-Santolino, were naive "amateurs."  Ubaldo, Syjuco, and Revereza had no experience

in the illegal weapons trade, and no criminal history.  Just as the undercover agent in Batres-Santolino immediately recognized the efforts of the defendants to appear as sophisticated drug dealers was "ludicrous," the undercover agent immediately noticed that Ubaldo, Syjuco, and Revereza were not sophisticated weapons traffickers, and could not obtain the type and number of weapons that he was looking for.

Like the undercover agent in Greene, who used veiled threats of retaliation from his "boss" to coerce the defendants to go through with the plan, and the informant in Batres-Santolino, who told the defendants that the "big man" was growing impatient with the delay in consummating the deal, the undercover agent repeatedly intimidated Syjuco and Ubaldo by telling them that his "boss" was a heavy drug cartel leader.  When Syjuco could not obtain RPG-7 rocket launchers, the UC told him that failing to deliver the weapons he promised was "not acceptable."  Id.

Finally, in this case, the government's agents did all of the work to instigate the crime, and nearly all of the work in carrying it out, just as the government agents did in Greene and Batres-Santolino.  Whereas in Greene, the government offered help in finding a site for the whisky still, providing hardware and raw ingredients, and agreed to purchase the entire output of the still, in this case, the undercover agent initiated the transactions, set the place for them to occur, and arranged, unilaterally, to have the weapons shipped to the United States.  The only role that any of the defendants had was to come up with the various weapons the UC was looking for, and they struggled to even do that much.  In any case, the defendants' conduct in providing weapons in the Philippines is not the crime with which they are charged.  The crimes alleged in the indictment all involve the *importation of those weapons into the United States*.  See Dkt. No. 25.  Just as the defendants in Batres-Santolino could not have imported large loads of cocaine into the United States on their own, Syjuco, Ubaldo, and Revereza lacked the means and wherewithal to ship weapons to the United States.  So, as was the case in Batres-Santolino, "the government obliged them and arranged that part of the enterprise as well."  See 521 F. Supp. at 751.

1   Because the government created this crime out of "whole cloth" just for the

2   purpose of prosecuting it, and because the government's agent in fact committed the

3   most important criminal acts himself, the Court should dismiss the indictment.

4

5                    2.    Using Unwarranted Mental or Psychological Coercion

6          Threatening or coercing a target to commit the crime can also be outrageous

7   government misconduct that violates the due process clause and requires dismissal.

8   See United States v. Emmert, 829 F.2nd 805, 811 (9th Cir. 1987).  In Emmert, the

9   defendant argued that government agents coerced him to proceed with a drug

10  transaction with threats and intimidation.  There, a paid FBI informant approached a

11  college student (Emmert) and offered a reward of $200,000 as a "finders fee" if he

12  could secure a supply of cocaine for the informant to buy.  Emmert attempted to put

13  together a deal, and introduced a drug supplier to a buyer (who was, unbeknownst to

14  the student, an undercover FBI agent).  But the seller showed up without the drugs he

15  had promised, and threatened to back out of the deal because of his concern that the

16  police might be involved.  Id. at 807.  During the same meeting, the undercover agent

17  expressed his anger at the unraveling of the deal, and made implicit threats to the

18  seller that if something goes wrong the seller might be harmed.  Id.  A few weeks

19  later, the paid informant spoke to Emmert's roommate, and told him that he and

20  Emmert had one week to make the sale that they had discussed "or else."  Id.  The

21  Ninth Circuit held that threats by government agents may be the basis for a "due

22  process claim for unwarranted mental coercion," but that there was "no independent

23  evidence" of coercive threats in the case before it.  Id. at 811.  Rather, the Court held,

24  the threats were "extremely weak," id. at 811 n. 2, and that Emmert would have likely

25  perceived them to be "ordinary bluster" or merely as an "ordinary bargaining tactic in

26  drug deals."  Id.; see also United States v. Fernandez, 388 F.3d 1199 (9th Cir. 2004).

27         In this case, the undercover agent told Syjuco that his boss was a member of a

28  violent Mexican drug cartel.  When Syjuco told him that he was unable to deliver the

grenade launchers he had promised, the UC reprimanded him and told him that he would accept this shortcoming only once.   In the future, he said, any failure to deliver "would not be acceptable."  Moreover, the UC was accompanied by Andy, a career gang member with a reputation for violence.  Andy claimed at various times to be a member of "United Bamboo," a Taiwanese criminal organization that is affiliated with the Triad, a crime syndicate feared throughout Asia.  By posing as threatening members of international criminal organizations, the government agents put psychological pressure on the defendants to complete the weapons deals.

### 3.    Conduct By Government Agents That Is *Malum In Se*

Finally, police involvement in a crime that is so wrong or moral as to be "*malum in se*" may violate the due process clause, even where it does not constitute over-involvement in the creation of the crime.  Ramirez, 710 F.2d at 540.  The most obvious example of such misconduct would be one in which the government actually created or promoted a crime of violence, causing harm to a victim, as part of its investigation of a crime.  Williams, 547 F.3d at 1201, n. 11 (quoting Hampton, 425 U.S. at 493 n. 4 (Powell, J., concurring) ("There is certainly a constitutional limit to allowing governmental involvement in a crime.  It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums.").

The Ninth Circuit has held that the use of prostitutes as informants does not necessarily rise to the level of "outrageous government misconduct," even where the prostitute becomes sexually intimate with the target of the investigation.  In United States v. Simpson, 813 F.2d 1462 (9th Cir. 1987), the government used a paid informant who was both a heroin addict and a prostitute to investigate the defendant, a known heroin dealer.  Id. at 1464-1471.  The prostitute posed as a stranded traveler at an airport, and in this way befriended the defendant.  She went on to have an 'intimate' relationship with him, although it was not clear whether or not they had

sexual intercourse.  The government agents did nothing to encourage the prostitute to have sex with the defendant.  Rather, they repeatedly instructed the woman not to become sexually intimate with him, and when they learned that she had disregarded that instruction, they asked that she stop.  Id. at 1468.  Nonetheless, they continued to use her as an informant despite the fact of this relationship.  Ultimately, the prostitute convinced the defendant to sell heroin to her 'friends,' who were undercover agents.

The Ninth Circuit held that the government's "passive tolerance" of the prostitute's "questionable conduct" as an informant was "less egregious than the conscious direction of government agents topically present in outrageous conduct challenges."  Id.  The Court left open the question (which is presented in this case) of whether "the use of sex as a law enforcement tool would 'shock the conscience' under circumstances where the government is clearly responsible, as would be the case if [the prostitute] had been a law enforcement officer rather than a paid informant."  Id.; see also United States v. Prarie, 572 F.2d 1316, 1319 n.4 (9th Cir. 1978) (finding no outrageous misconduct where a paid informant prostitute "emotionally and sexually" seduced the defendant and persuaded him to deal drugs because the prostitute was "neither paid nor asked by the agents to establish any particular relationship" and "the agents were unaware of her daily activities.").

In this case, the government's agents did not "passively" allow a prostitute to have sex with a defendant; the UC in fact employed prostitutes for the specific purpose of having sex with the defendants, and in addition employed the girls to have sex with himself.  Moreover, whereas in Prarie the prostitute was presumably an adult, in this case, many of the girls may be minors.  The government cannot credibly argue that its agents were unaware that they were paying for prostitution.  The prostitution happened in Area 51 and Air Force One -- well known brothels, and the undercover agent paid thousands of United States taxpayer dollars for it.  Nor can the government deny that Area 51 was trafficking in minor girls, as public criminal charges were filed in the Philippines alleging just such conduct in May 2012.

1    The government's irresponsible choices undeniably caused harm to the victims

2    of sex trafficking in Area 51.  Twenty minor girls had to be rescued and placed in safe

3    houses only months after the undercover agent had visited there and spent thousands

4    of dollars for "entertainment and cocktails."  See Exhibit F.  The fact that the

5    undercover agent paid prostitutes, many of whom were likely underage girls, to have

6    sex with himself and the defendants, surely "shocks the conscience."  Dismissal is

7    warranted based on that outrageous conduct alone.

8

9           **B.    DISMISSAL OF THE INDICTMENT IS ALSO AUTHORIZED**

10                 **UNDER THIS COURT'S SUPERVISORY POWERS**

11          Even if the government's misconduct does not rise to the level of a due process

12   violation, the court is nonetheless permitted to dismiss the indictment in an exercise of

13   its supervisory powers.  See Barrera-Moreno, 951 F.2d at 1091 (citing United States

14   v. Simpson, 927 F.2d 1088, 1090 (9th Cir. 1991) ("Simpson II")); United States v.

15   Ross, 372 F.3d 1097, 1107 (9th Cir. 2004).  "[S]upervisory powers are intended to

16   deter governmental misconduct and protect the integrity of the judicial process, while

17   constitutional analysis preserves fairness for the individual defendant."  Simpson II,

18   927 F.2d at 1091 (Nelson, J., concurring).

19          Dismissal is used as a prophylactic tool for discouraging future deliberate

20   governmental impropriety of a similar nature.  United States v. Samango, 607 F.2d

21   877, 884 (9th Cir. 1979) (affirming the district court's dismissal as a proper exercise

22   of its supervisory power).  The courts' supervisory powers permit dismissal of a case

23   "to implement a remedy for violation of recognized rights; to preserve judicial

24   integrity by ensuring that a conviction rests on appropriate considerations validly

25   before a jury; and finally, as a remedy designed to deter illegal conduct."  United

26   States v. Hasting, 461 U.S. 499, 505 (1983); see also United States v. Kojayan, 8 F.3d

27   1315, 1324-25 (9th Cir. 1993) (reversing a conviction based on prosecutorial

28   misconduct); United States v. Leung, 351 F. Supp. 2d 992, 997 (C.D. Cal. 2005)

                                              24

1   (dismissing case based on the government's misconduct).  These three grounds

2   support the overarching principle that a federal court's supervisory authority in a

3   criminal case "comprehends the power to dismiss the indictment whenever the pursuit

4   of truth and justice becomes tainted." <u>United States v. Butler</u>, 567 F.2d 885, 893 (9th

5   Cir. 1978) (Ely, J., concurring) (internal citations omitted).

6

7   **C.   AN EVIDENTIARY HEARING SHOULD BE HELD TO**

8   **DETERMINE THE FULL EXTENT AND NATURE OF THE**

9   **GOVERNMENT'S OUTRAGEOUS MISCONDUCT**

10      If the government denies any of the factual allegations herein, the defendants

11   respectfully request that the Court hold an evidentiary hearing to resolve them.

12

13                                    **III.**

14                               **Conclusion**

15      For the reasons expressed herein, The defendants respectfully requests that the

16   Court dismiss the indictment.  The defendants respectfully request an evidentiary

17   hearing so that the full extent of the government's misconduct can be determined.

18

19                                    Respectfully submitted,

20                                    SEAN KENNEDY
                                      Federal Public Defender

21

22   DATED: September 17, 2012        By: _/s/ John Littrell_____
                                          JOHN LITTRELL
23                                        Deputy Federal Public Defender

24

25

26

27

28